GSA

GSA National
Capital Region

NOV 2 1 2007

Hillian Brothers & Sons, Inc.
8501 Ardwick-Ardmore Rd
Landover, Maryland 20785

Re: Correct Water Penetration Problems project located at the Education Building (FOB #6) 400 Maryland Ave, S.W., Washington, DC, (the "Project"); GS-11P03YAD0040 / P-11-05-YT-0156 / RDC-41024

Hillian Bros. & Sons, Inc. (hereinafter "Hillian") submitted a certified claim to the Contracting Officer on February 12, 2007, requesting a Contracting Officer's Final Decision concerning its claim that GSA has failed to pay Hillian $306,091.45, in connection with work performed by Hillian pursuant to Contract No. GS-11P030YAD0040 and Order Number P-11-05-YT-0156/RDC-41024 dated March 31, 2005 (hereinafter the "Contract"). On April 5, 2007, Hillian revised its February 12, 2007 claim by increasing its original claim from $306,091.45 to $331,773.45. GSA asserts that Hillian is due $41,175.07 for work performed after deductions for damages to property and overpayments made to Hillian by GSA. Therefore GSA denies Hillian's claim in part.

<u>The Contract</u>

GSA awarded the Contract for work related to the correction of water penetration problems at the Department of Education Building (FOB #6) at 400 Maryland Ave., S.W., Washington, DC, to Hillian, on March 31, 2005. The Contract contained the following provisions relevant to Hillian's claim and this Final Decision:

1. Specification Section 02070 "Selective Demolition" provides:

3.1 Protection

A. Before starting demolition, the Contractor shall be solely responsible for making the necessary arrangements and performing the necessary work involved in connection with discontinuance or interruption of public and private utilities or services or components of said utilities or services under jurisdiction of the Owner, utility companies or corporations, Police Department, Fire Department, and Public Works Department including but not limited to gas, electricity, steam, refrigeration, telephone, telegraph, police signal, fire alarm, water, sanitary sewer, storm drainage and other systems which will be affected by the work to be performed under this Contract.

B. The Contractor shall preserve in operating condition active utilities traversing the Work site and shall protect manholes, catch basins, valve boxes and other appurtenances. He shall repair damage to any such utility, due to work under this Contract, to the satisfaction of the Contracting Officer.

D. Adequate protection of persons and property shall be provided at all times. The work shall be executed in a manner to avoid interference with the use of adjacent buildings, areas or properties, and to avoid interruption of free passage to or from such buildings or properties.



ALL-STATE LEGAL®
Ex. 9

3.6 Cleanup

A. The building and adjacent areas shall be left in a broom-clean condition at the end of each day.

B. B. On completion of the work of this section and after removal of debris, the site shall be left in a clean condition satisfactory to the Contracting Officer.

2. Section 02070- 3.5 "Repair of Damages" provides:

A. The Contractor shall provide a list of damaged or deteriorated elements of the building and adjacent areas to the Contracting Officer prior to demolition and shall be responsible for repair or replacement of damaged or deteriorated items not on that list when the operations of the Contractor are substantially complete.

B. Damage to any portion of the building which results in disruption of or inconvenience to the Government or its employees shall be immediately repaired or replaced by the Contractor. If such restitution is not promptly made, the Contracting Officer shall have the necessary work performed by an outside agency at the Contractor's expense.

C. The Contractor shall note the Government's concern for the preservation and protection of facility vegetation and landscaping. Damage to such finishes shall be repaired or replaced to the satisfaction of the Contracting Officer at no additional cost.

3. Section 00120 "Supplementary Instructions to Bidders" Part 10 FAR 52.236-7 "Permits and Responsibility (Nov 1991):

The Contractor shall without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work. The Contractor shall also be responsible for all damages to persons or property that occurs as a result of the Contractor's fault or negligence. The Contractor shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire work, except for any completed unit of work which may have been accepted under the contract.

4. Section 01300 "Submittals":

1.3 "General Submittal Requirements"

A. General: Submit construction progress schedule within seven calendar days after the Notice to Proceed is received. The construction progress schedule shall include all work related submittals.

B. Scheduling: Submit schedule of submissions for approval by the Contracting Officer, within ten calendar days after notice to proceed is received, unless otherwise stated.

<u>Relevant Facts</u>

The Contract had a fixed price of $3,315,525.00, and for payment purposes, the work was divided into exterior work, which was separated into phases A,B,C,D[1], and interior work, which consisted of Sub-Subbasement Soffit, West Subbasement Floor, West Subbasement Soffit "Option G-2," East Subbasement Soffit, South Garage Soffit. Subsequently, Hillian further broke out South Garage Soffit into Phase I, South Garage Soffit, Phase II, South Garage Soffit, Phase III, and South Garage, Driveway. As a result of change order AS04, the Contract completion date was extended to July 20, 2006.

---

[1] The contract drawings refer to phases A, B, C and D as Phase III, IV, and I and II, respectively.

From the beginning, Hillian failed to prosecute the work under the Contract in a timely manner necessary to finish the project by the project completion date. By February 8, 2006, Hillian was severely behind schedule and had yet to complete phase 1 in the South Garage. As a result, GSA requested that Hillian provide a detailed schedule showing how it planned to complete the work in Phase A, South Garage, Sub basement vault, East vault, and West vault areas. GSA gave Hillian a deadline date of February 14, 2006 to provide GSA the detailed schedule. However, by February 17, 2006, it was apparent to GSA that Hillian was not likely to complete all phases of the project by the July 20, 2006 completion date, and GSA issued a stop work order for all phases of the project with the exception of Phase A and South Garage Soffit, Phase 1. Thereafter, Hillian's failure to timely complete project milestones continued, and an identical stop work order was issued on May 18, 2006, directing Hillian to stop work on the listed items until July 31, 2006. On May 25, 2006, GSA rejected Hillian's May 23, 2006 request to extend the project completion date from July 20, 2006 to August 4, 2006. GSA informed Hillian that the completion date of July 20, 2006 would not change and that Hillian would be accessed liquidated damages of $340.00 starting July 21, 2006.

On September 25, 2006, GSA issued a show cause letter to Hillian informing it that GSA was considering terminating the Contract under the default clause in the Contract and instructed Hillian to submit any fact, in writing, which evidenced that Hillian's failure to perform arose from causes beyond Hillian's control and without fault or negligence contributable to Hillian. An onsite meeting was held on September 28, 2006 between GSA and Hillian, in which Hillian was instructed to remove all of its equipment from the jobsite. On the same day Hillian submitted a response to GSA's September 25, 2006 show cause letter. Subsequently, GSA confirmed Hillian's dismissal from the jobsite in writing, and informed Hillian that GSA was considering Hillian's September 28, 2006 letter- only to decide whether to terminate Hillian for default or for convenience. GSA never informed Hillian that it had chosen to terminate Hillian for the convenience of the government.

Hillian submitted a certified claim to the Contracting Officer on February 12, 2007. The claim demanded payment of $306,091.45 for the items discussed below. On April 5, 2007 Hillian supplemented its February 12, 2007 claim increasing its claim from $306,091.45 to $331,773.45.

Discussion

Hillian's February 12, 2007 claim and its April 5, 2007 supplement are based on the premise that Hillian was terminated for the convenience of the government, pursuant to FAR 52.249-4. Accordingly, Hillian's claim is for payment for services rendered by Hillian to GSA before the effective date of termination. GSA's position on the individual costs representing Hillian's total claim is represented below.

**A. Hillian's February 12, 2007 Claim**

**1. Phase A Work**

Hillian claims it performed 19,375.31 SF of actual work on Phase A of the Contract, prior to termination, and is due $194,406.45. GSA disagrees with Hillian's claim for Phase A work, and asserts that pursuant to the Contract, Phase A only includes 15,615 SF of work. The amount of SF for Phase A was verified by GSA using a Computer Assisted Design Drawing ("hereinafter "CADD") program and by measuring the actual area represented in the Contract.

GSA further asserts that Hillian is due $82,515, which represents the remaining funds under the Contract for Phase A work.

**2. Disputed Change Orders**

A) GRANITE:

Hillian's claim includes $39,872 for the removal of granite in order to perform waterproofing work. GSA finds that the removal of all existing column cladding (lower sections) would be required to perform the installation of the new waterproofing, pursuant to Contract specification section 01010-1(f) "Summary of Work" and drawing A-5-02 detail 5 Therefore, GSA denies Hillian's claim for $39,872 for removal of granite.

B) 4 FANS/STARTUP:

Hillian's claim includes $4526.00 for the removal of four fans, asserting that it was not required, pursuant to the Contract, to remove the four fans, which were located in the North West entrance building, because the fans were not indicated on the Contract drawings. Hillian goes on to state that these items were an "unforeseen subsurface condition."

GSA contends that these items were not an unforeseen subsurface condition, when in fact they are highly visible within the vestibule and should have been removed during the work item of removing the vestibules per Contract. Therefore GSA denies Hillian's claim for $4526.00 for removal of the four fans located at the North West entrance.

C) PRECAST CONCRETE:

Hillian is requesting that GSA reconsider its July 17, 2006 Contracting Officer's Final Decision, in which GSA denied Hillian's claim for $31,785.93, related to pre-cast concrete GSA rejected. GSA has reviewed its decision and will not reconsider it, and asserts that the July 17, 2006 decision speaks for itself.

3. Retainage

Hillian's claim includes $74,346.00 for retainage. GSA agrees that GSA is holding $74,346.00 in retainage for work performed prior to termination. GSA asserts Hillian is not entitled to the total $74,346.00 due to GSA's entitlement to certain credits and deductions as set forth below.

B. GSA Credits and Deductions

1. Interior Work

In Hillian's February 12, 2007 claim it states that it performed a portion of the interior work before GSA instructed it to cease work on the interior per a stop work order issued May 18, 2006. Hillian further asserts that the parties agreed that the work was 37% complete at the time the stop work order was issued with a total value of $291,563.80.

GSA asserts that prior to the May 18, 2006 stop work order for the interior work, GSA paid Hillian $291,562.00 for interior work based on invoices submitted by Hillian,and inspection reports submitted by the GSA Construction Manager.. However, Hillian did not complete work valued at $291,562.00. After the stop work order was issued, GSA performed a review of the actual interior contract work (SF) performed by Hillian within the sub confined space and compared it to the original Contract work (SF) to be performed. The review indicated that GSA had overpaid HBS with regards to the actual percentage of interior work performed. The actual percentage of work performed was 23%. Since Hillian only performed 23% of the interior work, GSA is due $57,440 from Hillian, which represents the amount Hillian was overpaid for the interior work. GSA considers this a debt pursuant to FAR Subpart 32.6. This

should be considered a demand for that debt.

2. **GSA Deductions/Credits in Hillian's Claim**

Hillian's February 12, 2007 claim included deductions and or credits to GSA for, Concrete Cleaning ($5000.00), and Stone Restoration Cleaning ($5775.00). GSA agrees with these deductions and/or credits which Hillian owes to GSA, and demands payment of these items.

Hillian included a deduction and or credit to GSA for CE7-CE10 ($779.00). GSA's calculations show this deduction and or credit to be ($739.00).

Hillian also included a $6290.00 credit and/or deduction to GSA for damage to plants caused by Hillian's failure to perform pursuant to the Contract. Since Hillian submitted its claim, additional plants have died as a result of Hillian's lack of performance and GSA is now due $10,219.00, and GSA demands payment of this item.

Hillian's claim also included deductions for liquidated damages, which GSA has subsequently decided not to assess.

3. **GSA Deductions/Credits Not in Hillian's Claim**

Hillian claims that the December 21, 2006 GSA deductions in the amount of $44,187.00 were not properly assessed and that Hillian was not responsible for these costs. GSA disagrees and asserts that pursuant to Section 02070,Section 00120 and Section 02070 of the Contract, Hillian is responsible for all cleanup and damages to government property caused by the Contractor's fault or negligence. The following costs deductions and credits are owed GSA for impacts or damages to property caused by Hillian:

**a. Impact to Normal Dumpster Service**

Per Contract Section 02070 "Selective Demolition" subsection 3.1D, Hilllian was required to execute all work "in a manner to avoid interference with the use of adjacent buildings, areas or properties, and to avoid interruption of free passage to or from such buildings or properties." Hillian did not comply with these provisions and the failure to do so resulted in GSA incurring costs.

Hillian's performance of contract work on the South Garage, interfered with the building's garbage pickup service, because the equipment blocked access to the building's dumpsters. Hillian was informed of this issue by the building manager, and Hillian assured the building manager that it would remove garbage in lieu of the building's regular service. Hillian removed garbage for a short period of time, and the government was forced to make alternative arrangements to have garbage removed from the property. The additional costs to remove the garbage as a result of Hillian's failure either to move its equipment or provide for garbage removal was $8,450.00, and GSA demands payment of this amount to GSA by Hillian.

**b. Negligent Activation of Sprinkler/Alarm System**

Per Contract Section 02070 subsection 3.1A and B, Hillian is solely responsible solely responsible for making the necessary arrangements and performing the necessary work involved in connection with discontinuance or interruption of utilities, including fire alarm, which will be affected by the work to be performed under this Contract. Furthermore, Hillian shall preserve in operating condition active utilities traversing the Work site and shall repair damage to any such utility, due to work under this Contract, to the satisfaction of the

Contracting Officer. Hillian did not comply with these provisions and the failure to do so resulted in GSA incurring costs.

Hillian negligently activated the sprinkler and fire alarm system while working in the South Garage, and the Government's Fire Alarm Shop had to come to the building, address the activation of the sprinkler and fire alarm system, reset the dry sprinkler system, and reset the fire alarm system. The direct cost to the government resulting from Hillian's negligence was $650.00, and GSA demands payment of this amount from Hillian.

**c. Clean up Impact to the First Floor West Training Center**

Per Contract Section 02070, Hillian was required to leave the site upon completion of the work "in a clean condition satisfactory to the Contracting Officer." Additionally, per section 02070, "[t]he building and adjacent areas shall be left in a broom-clean condition at the end of each day."

Hillian did not comply with either of these sections as it failed to maintain adequate dust control. As a result of Hillian's failure to comply with these sections, GSA incurred $1,700 to have a cleaning company perform this task. Moreover, per Lawrence Hillian's email dated January 6, 2006 to Ralph Hook, GSA's Building Manager for the building, Hillian agreed to pay the cost of this task. See Exhibit 1.

**d. Clean up Impact to the SB-103**

Per Contract Section 02070, Hillian was required to leave the site upon completion of the work "in a clean condition satisfactory to the Contracting Officer." Additionally, per section 02070, "[t]he building and adjacent areas shall be left in a broom-clean condition at the end of each day."

Hillian did not comply with either of these sections as it failed to maintain adequate dust control. Due to Hillian's failure to comply with these sections, GSA's building engineer incurred $3,834 to clean all mechanical, electrical equipment, ductwork and piping.

**e. Confined Space Mechanical Air Handling Equipment**

Per Contract Drawing M-0-01 "Sequence of Operation", Hillian was required to . Hillian did not comply with these requirements because the provided mechanical equipment installed did not perform as required per the sequence of operation during testing; GSA was not able to complete the testing of this equipment due to the fact it failed to perform as required. See Exhibit 2. GSA is entitled to $5000.00 from Hillian, due to Hillian's failure to perform, so that GSA can acquire services to have this equipment brought into compliance with the Contract specifications.

**f. Lengthy Submittal Process**

Per Contract section 01300 1.3B, Hillian is required to submit its Contract submittals to GSA within ten calendar days after notice to proceed. Hillian did not comply with section 01300 and submitted its items 10 months into the Contract's term. Accordingly, GSA is entitled to $16,881 for the additional expense associated with retaining the A/E to review the late submittals.

**g. Final Documentation**

Per Contract section Section 01300 "Submittals," Hillian is to provide As-built drawings and a waterproofing warrantee. Hillian must provide these items to GSA by December 21, 2007, on all work Hillian performed.

C. **Hillian's Revised Claim dated April 5, 2007**

1. Custom Granite Pieces

Hillian contends its subcontractor, Pagliaro Brothers Stone Co., Inc. ("Pagliaro") "provided certain materials including, but not limited to, custom granite pieces for phases B, C and D of the Project. This material was delivered to the Project site and retained by GSA upon termination for convenience of the contract." Hillian requests $25,682.00 for this item.

Hillian is not entitled to an equitable adjustment for this item. GSA paid Hillian for all (phases a, b, c and d) of the Contract stone work for materials and labor. The item relates to Contract work item #A-6, which requires the replacement of existing broken column cladding indicated on the Contract drawings. Hillian requested payment of all (26 pieces) A-6 pieces in payment #7-rev 3. GSA received the actual invoices for these items and inspected the stones at Pagliaro's storage yard. GSA found these items to be acceptable with one exception; the contractor had provided 26 pieces of the same color (white) when in fact 2 of the 26 pieces were required to be dark A-6 pieces per Drawings A-1-02 & A-1-03. This was acknowledged by Bob Bennadetti of Pagliaro when both GSA and Pagliaro reviewed the contract drawings in Bob's office. GSA then approved the payment of the A-6 stored material items (actual invoice of $15,000 – 26 pieces) of $16,940, the difference ($1,940) to cover the handling of the stones. The payment was broken down as follows; phase A $5,084, phase B $5,080, phase C $3,388 & phase D $3,388. GSA has paid in full for these items (materials & mark up).

Based on the foregoing, Hillian is entitled to $41,175.07, which represents the amount owed to Hillian minus credits, deductions and or overpayments owed to GSA.

This is the final decision of the Contracting Officer. You may appeal this decision to the Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Board of Contract Appeals and provide a copy to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. Instead of appealing to the Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receives the decision. If you appeal to the Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less.

Sincerely,

Michael Vrobel

Michael Vrobel
Contracting Officer
General Services Administration

Enclosures: 1 & 2

Ralph Hook III/WPJ/RW/GSA/GOV
01/06/2006 01:38 PM

To Kathleen K. Geisler/WPJ/RW/GSA/GOV@GSA
cc Michael J. Vrobel/WPJ/RW/GSA/GOV@GSA, Mark A. DeMarr/WPJ/RW/GSA/GOV@GSA, John H. Gott/WPJ/RW/GSA/GOV@GSA
bcc
Subject Fw: Proposal the clean the Training Center (1st fl. west)

Thanks everyone please see note below

Ralph F. Hook III
GSA Building Manager
CREATING A SUCCESSFUL FUTURE AT GSA
by living our values everyday and working together to achieve our goals.
----- Forwarded by Ralph Hook III/WPJ/RW/GSA/GOV on 01/06/2006 01:34 PM -----

"Lawrence Hillian" <lawrence@hillianbrothers.com>
01/06/2006 01:31 PM

To ralph.hook@gsa.gov
cc
Subject RE: Proposal the clean the Training Center (1st fl. west)

Mr Hook,

We give an O.K. to do the work and we will pay the cost in the proposal.

Lawrence Hillian

-----Original Message-----
From: ralph.hook@gsa.gov [mailto:ralph.hook@gsa.gov]
Sent: Friday, January 06, 2006 1:17 PM
To: Anthony@Hillianbrothers.com; Lawrence@Hillianbrothers.com
Subject: Fw: Proposal the clean the Training Center (1st fl. west)

Lawrence/Anthony

Please see proposal review cost and give the o.k. to move forward with the work below.

Ralph F. Hook III
GSA Building Manager
CREATING A SUCCESSFUL FUTURE AT GSA
by living our values everyday and working together to achieve our goals.
----- Forwarded by Ralph Hook III/WPJ/RW/GSA/GOV on 01/06/2006 01:11 PM -----

christopher.crowe@astwestinc.com

To

01/06/2006 09:03 AM

ralph.hook@gsa.gov

cc

Subject
Proposal the clean the Training Center (1st fl. west)

Dear Mr. Hook :

Thank you very much for the opportunity to submit our proposal for cleaning the Training Center.

The cost for this service is $5,700.00 including all supplies, manpower and supervision.

We will clean the whole Training Center (1st floor west). Vacuuming ,shampooing ,cleaning and dusting all walls, furnitures, blinds, sills etc....

Please do not hesitate to contact us at (703) 675-3319 if you require additional information. Thank you for your consideration. We look forward to doing business with you.

Sincerely

East West Project Manager
Christopher Cao

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.371 / Virus Database: 267.14.14/222 - Release Date: 1/5/2006

RDC-41024

# SEQUENCE OF OPERATION

TYPICAL OPERATION FOR VENTILATION SYSTEMS IN EAST AND WEST UPPER VAULTS AND CENTRAL LOWER VAULTS

1. EXHAUST FAN SHALL BE INTERLOCKED WITH SUPPLY FAN SUCH THAT EXHAUST FAN SHALL OPERATE WHEN ASSOCIATED SUPPLY FAN IS OPERATING.

2. SUPPLY FAN SHALL START AND RUN CONTINUOUSLY WHEN ASSOCIATED WALL-MOUNTED HUMIDISTAT SENSES A RELATIVE HUMIDITY OF 60% OR GREATER.

3. MANUAL SWITCH AT ENTRANCE TO VAULT SHALL PROVIDE MANUAL START OF ASSOCIATED FAN, BUT IT SHALL NOT SHUT DOWN FAN IF HUMIDISTAT CALLS FOR VENTILATION.

4. CONNECT CONTROLS TO BUILDING MANAGEMENT SYSTEM FOR MONITORING AND PROVIDE ALARM AT CENTRAL CONTROL STATION TO INDICATE FAN FAILURE.

OPERATION OF DUCT HEATER- CENTRAL LOWER VAULTS ONLY

1. UPON SENSING SUPPLY AIR TEMPERATURE OF LESS THAN SETPOINT OF 13°C (ADJUSTABLE), DUCT-MOUNTED THERMOSTAT SHALL SIGNAL DUCT HEATER TO ENERGIZE UPON PROVING AIR FLOW. DUCT HEATER SHALL OPERATE TO MAINTAIN SETPOINT. UPON RISE IN SUPPLY AIR TEMPERATURE TWO DEGREES ABOVE SETPOINT, DUCT HEATER SHALL SHUT OFF.

2. CONNECT CONTROLS TO BUILDING MANAGEMENT SYSTEM FOR MONITORING AND PROVIDE ALARM AT CENTRAL CONTROL STATION TO INDICATE HEATER FAILURE.

Drawing M-0-01

Exhibit #2